OPINION
{¶ 1} Defendant-appellant, Mark E. Burke, appeals from a judgment of the Franklin County Court of Common Pleas (1) granting his request for a new trial on one charge of aggravated murder with specifications, and on one specification to the other count of aggravated murder, but (2) denying his motion for a new trial on both the second count of murder and an aggravated robbery charge. Because defendant is entitled to a new trial on both counts of aggravated murder with the accompanying death penalty specifications, as well as the aggravated robbery charge, we reverse and remand. *Page 2 
I. Procedural History {¶ 2} Defendant's appeal arises from an extensive procedural history. As a result of the death of William McBride in 1989, defendant was indicted on two counts of aggravated murder with death penalty specifications and one count of aggravated robbery. Count 1 charged defendant with aggravated murder by prior calculation and design in violation of R.C. 2903.01(A); Count 2 charged defendant with aggravated murder in violation of R.C. 2903.01(B) by purposely causing the death of McBride while committing or attempting to commit, or while fleeing immediately after, an aggravated robbery. Each aggravated murder count carried two death penalty specifications: (1) under R.C. 2929.04(A)(3), the aggravated murder occurred for the purpose of escaping detection, apprehension or punishment for the crime of aggravated robbery; and (2) under R.C. 2929.04(A)(7), the aggravated murder occurred during or immediately after an aggravated robbery, and defendant was either the principal offender or acted with prior calculation and design.
 {¶ 3} A jury convicted defendant of both counts of aggravated murder. On Count 1, the jury found defendant guilty of aggravated murder by prior calculation and design with its attendant death penalty specifications under R.C. 2929.04(A)(3) and 2929.04(A)(7). On Count 2, the jury returned a guilty verdict on the charge of aggravated murder and the escaping detection specification under R.C. 2929.04(A)(3); the second specification was not submitted to the jury. In addition, the jury found defendant guilty on the charge of aggravated robbery.
 {¶ 4} On the jury's recommendation that defendant receive the death penalty, the trial court merged Counts 1 and 2 for purposes of sentencing, the state elected that *Page 3 
defendant be sentenced on Count 1, and the trial court sentenced defendant to death. In State v. Burke (Dec. 28, 1993), Franklin App. No. 90AP-1344, this court affirmed defendant's conviction and sentence. On appeal, the Ohio Supreme Court affirmed. State v. Burke (1995),73 Ohio St.3d 399. Defendant's petition for writ of certiorari to the Supreme Court was denied on March 25, 1996. Burke v. Ohio (1996), 517 U.S. 1112.
 {¶ 5} On September 19, 1996, defendant filed a petition for post-conviction relief. At the hearing on defendant's petition, Dr. Keith Norton, the forensic pathologist who performed the victim's autopsy, testified that some of his trial testimony was erroneous. Defendant's petition was denied in a decision rendered February 17, 1998; the decision was affirmed in State v. Burke (Feb. 17, 2000), Franklin App. No. 99AP-174.
 {¶ 6} On May 22, 2001, defendant filed an application to reopen his direct appeal pursuant to App.R. 26(B). His application was denied inState v. Burke (Nov. 15, 2001), Franklin App. No. 90AP-1344. On July 23, 2001, defendant filed a motion for leave to file a motion for new trial based on Norton's changed testimony. Although the trial court denied defendant's motion, this court on December 7, 2004 reversed the trial court and concluded defendant's counsel was ineffective for failing to earlier file a motion for new trial.
 {¶ 7} On remand, the trial court granted defendant a new trial on Count 1. The court found that Norton's changed testimony had a strong probability of affecting the outcome of defendant's trial on the issue of prior calculation and design. In addition, the trial court ordered a new trial for second specification to Count 2, the specification not submitted to the jury in the original trial, but it did not order a new trial for Count 2 itself. Instead, the trial court "unmerged" Count 2 from Count 1 and scheduled a sentencing *Page 4 
hearing on Count 2. Lastly, the trial court upheld defendant's conviction and sentence on the charge of aggravated robbery. The state sought leave to appeal the trial court's decision granting a new trial; we denied the state's motion.
II. Factual History {¶ 8} The trial court granted defendant's motion for a new trial because Dr. Keith Norton recanted his trial testimony dealing with five so-called "healing" wounds. At defendant's trial in 1990, Norton testified that McBride, the victim, had a total of 13 wounds, including one exit wound. Norton stated that five of the wounds on the right side of McBride's chest, numbers five, seven, eight, nine and thirteen, showed evidence of healing. Norton estimated the healing process would take about two hours, but at a minimum one hour, to begin. Because the five wounds showed signs of healing, Norton opined that they were inflicted at least one hour before the other stab wounds. Further, because the healing process ceases after a person dies, Norton testified that McBride was alive during the time five wounds were inflicted. The state used Norton's testimony to demonstrate the lapse of time between the five "healing" wounds and the subsequent stab wounds that ultimately killed McBride and, in turn, to argue the lapse of time was evidence that for at least one hour prior to McBride's death, defendant planned to kill him.
 {¶ 9} At the 1997 hearing on defendant's petition for post-conviction relief, Norton changed his opinion about the "healing" wounds. Norton testified that, rather than showing evidence of healing, the wounds were shallow and simply demonstrated that McBride was old. Norton not only explained why he was initially mistaken regarding the nature of the wounds, but he also confirmed his changed opinion with two colleagues, Dr. Fardal, Franklin County's Chief Forensic Pathologist, and Dr. Tate. Fardal and Tate both *Page 5 
agreed that although the five wounds had peculiar characteristics, they displayed no evidence of healing.
 {¶ 10} Norton further testified that a chain link fence could have caused some of the five wounds, stating, "the wounds that I said were originally healing appeared to be the result of going over a fence where the wire mesh instead of stopping at the bar actually stopped above the bar and caused some shallow wounds." (August 7, 1997 Tr. 35.) His continued testimony established that when Norton was at the scene, he saw a fence near where he found McBride, and that McBride's wounds were "consistent with either trying to scale that fence or go over that fence. * * * They appeared to be consistent with that for the most part. Their spacing is generally about right and also with the irregularities of that fence, yes, it looked like there would have been the sharp points necessary for causing the wounds." Id. at 36.
 {¶ 11} Norton testified that Fardal similarly commented on the irregular spacing of the wounds. "And then Doctor Fardal even pointed out there were a couple different possibilities for how that could have happened. And one of them they mentioned was the fence. I remember the fence at that point and things like that started falling into place * * *." Id. at 39. On cross-examination, Norton stated it was possible the five wounds resulted from being prodded with a knife but it seemed "unlikely," as it was "more likely" the nearby fence caused them. Id. at 42. Norton's testimony at the hearing on defendant's post-conviction petition was consistent with that given at the 2005 hearing on defendant's motion for a new trial. (See November 21, 2005 Tr.)
 {¶ 12} At the 2005 hearing, Fardal confirmed to a reasonable degree of medical certainty that he saw no evidence of healing. Fardal also testified that the wounds were *Page 6 
separated into groups. One group, the wounds on the right side of McBride's chest, had a "sequential appearance" to them. Id. at 52. Fardal noted that some of the wounds were spaced equally apart, indicating that a certain type of chain-link fence could have caused the pattern. Id. "So I says, I mean, that's the only thing I could think of at that time that would give that kind of pattern or instrument. I said that's what it kind of looks like. I said where was this guy found. And I says, I guess there was a fence nearby in relationship to the body. So I told [Norton] at that time to go down there and measure the distance between the curls in the top of the fence where the twirls were, * * * and see if it kind of fits with what's on the side of this man's body. * * * And comparatively speaking they fit pretty good. Doesn't necessarily mean that's what caused them, but it fit with kind of the pattern that we saw." Id. at 52-53.
 {¶ 13} On cross-examination, Fardal stated the pattern of the wounds could be consistent with someone being prodded by a knife. On re-direct, however, Fardal reiterated that the fence could have caused the wounds because the wounds fit the pattern of the fence. Id. at 78. Fardal expressed no opinion concerning any of the "sharp instrument" wounds. Although Fardal told Norton to go back to the crime scene and measure the fence, Norton failed to do so.
 {¶ 14} In its opinion granting a limited new trial, the trial court stated that "Dr. Norton's testimony provided the State with a key component of its proof regarding the element of prior calculation and design, which was required both to prove aggravated murder as well as the prior calculation and design specifications." (Trial Court Opinion, 18.) As the trial court explained, "Dr. Fardal's theory that the fence at the scene could have caused McBride's five wounds could have altered the jury's perspective on Burke's *Page 7 
testimony at trial. Burke had testified that he could not explain the existence of the five wounds. Had Burke's other testimony concerning the circumstances surrounding the stabbing been corroborated by Dr. Fardal's fence theory, the jury may well have come to a different conclusion as to Burke's credibility and whether there was prior calculation and design." Id. at 19.
 {¶ 15} Defendant appeals from the trial court's decision denying him a new trial on Count 2 and the charge of aggravated robbery, arguing that the recanted testimony affects all counts. Specifically, defendant assigns the following errors:
 ASSIGNMENT OF ERROR NO. I:
 THE TRIAL COURT'S DECISION LIMITING THE EFFECT OF SIGNIFICANT NEW EVIDENCE TO ONE COUNT AND THEREBY GRANTING A NEW TRIAL ON ONLY ONE COUNT, WHILE LEAVING THE REMAINING COUNTS IN PLACE, IS WHOLLY UNSUPPORTED BY THE LAW AND THE FACTS, IS ILLOGICAL, AND DENIES BURKE DUE PROCESS, A FAIR TRIAL, THE RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AND THE RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 2, 10 AND 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR NO. II:
 THE TRIAL COURT'S DECISION THAT IN THE FACE OF A NEW TRIAL BASED ON NEW EVIDENCE, A COURT CAN UNMERGE AND RESURRECT A MERGED COUNT, ORDER A SENTENCING HEARING ON THE RESURRECTED COUNT AND AT THE SAME TIME SET A NEW TRIAL ON THE UNMERGED COUNT, VIOLATES DOUBLE JEOPARDY AND R.C. 2941.25
IGNORES CASE LAW ON MERGER AND ELECTION AND DEFIES LOGIC. THIS DECISION VIOLATES THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE *Page 8 UNITED STATES CONSTITUTION AND ARTICLE I §§ 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR NO. III:
 THE TRIAL COURT'S DECISION SETTING A NEW TRIAL ON SPECIFICATION TWO OF COUNT TWO (AFTER A SENTENCING ON COUNT TWO) CANNOT STAND. THE TRIAL COURT'S DECISION IN THIS REGARD VIOLATES THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, § 2, 10 AND 16 OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR NO. IV:
 THE TRIAL COURT ERRED IN FAILING TO FIND APPELLANT GUILTY OF THE LESSER INCLUDED OFFENSE OF MURDER THEREBY COMPLYING WITH THE DOUBLE JEOPARDY CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENT AND THE DOUBLE JEOPARDY CLAUSE OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR NO. V:
 BURKE IS INELIGIBLE FOR A DEATH SENTENCE ON COUNT TWO ABSENT A NEW TRIAL. A DEATH SENTENCE ON COUNT TWO AT THIS TIME WOULD VIOLATE THE EX POST FACTO LAWS OF THE UNITED STATES AND OHIO CONSTITUTIONS AS WELL AS THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS AND CORRESPONDING OHIO PROVISIONS.
 ASSIGNMENT OF ERROR NO. VI:
 THE TRIAL COURT ERRED IN CONCLUDING THAT BURKE'S MOTION FOR NEW TRIAL BASED ON TRIAL COUNSEL'S INEFFECTIVENESS IN FAILING TO INVESTIGATE, OBTAIN FUNDING FOR EXPERTS AND FAILING TO OBTAIN AND PRESENT EXPERT OPINIONS WAS BARRED BY RES JUDICATA. *Page 9 
III. First Assignment of Error {¶ 16} In the first assignment of error, defendant contends the trial court erred in limiting the effect of Norton's recanted testimony. Contending that the recanted testimony would affect the jury's view of evidence relating to all of the charged offenses, defendant maintains he is entitled to a new trial on Counts 2 and 4 as well.
 {¶ 17} Pursuant to Crim.R. 33(A)(6), a new trial may be granted on a defendant's motion when "new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." A new trial may be warranted due to newly discovered evidence if the convicted offender demonstrates that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before trial, (4) is material to the issues, (5) is not merely cumulative to the other evidence, and (6) does not merely impeach or contradict the other evidence. State v. Hawkins (1993),66 Ohio St.3d 339; State v. Petro (1947), 148 Ohio St. 505; State v. Norman, Franklin App. No. 04AP-1312, 2005-Ohio-5087.
 {¶ 18} The determination of whether a new trial is warranted is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. A witness's recantation of his or her trial testimony can be considered newly discovered evidence if the trial court finds the new testimony credible and if the new testimony would materially affect the outcome of the trial. City of Toledo v.Easterling (1985), 26 Ohio App.3d 59. Importantly, recantation does not entitle the convicted offender to a new trial as a matter of law. Id. "The recantation must so affect the character of the evidence that *Page 10 
there is a strong probability that a different verdict would result." Id. at 62, citing State v. Lopa (1917), 96 Ohio St. 410; State v.Hutchison (Dec. 14, 1988), Summit App. No. 13626 (stating that defense counsel's bare assertions that the recanted testimony was the key to the guilty verdict is insufficient to demonstrate a strong probability of a different outcome).
 {¶ 19} The parties do not dispute that Norton's changed testimony is credible. The issue before us is whether a strong probability exists that the recanted testimony would change the verdict as to Counts 2 and 4. Defendant asserts that if the changed testimony affects defendant's credibility on the issue of prior calculation and design, it necessarily affects his credibility as a whole and thus implicates Counts 2 and 4.
 {¶ 20} In Count 2, defendant was charged with "purposely" causing McBride's death while committing an aggravated robbery. R.C. 2903.01(B). Unlike prior calculation and design, purpose or intent to kill can be formed instantaneously. State v. Campbell (1994), 69 Ohio St.3d 38. A person acts purposely when it is his or her specific intention to cause a certain result. Alternatively, purpose is found when the gist of the offense is a prohibition against conduct of a certain nature, and regardless of what the offender intends to accomplish thereby, it is his or her specific intention to engage in conduct of that nature. R.C.2901.22(A). Purpose or intent to kill may be proved by circumstantial evidence. State v. Calderon, Franklin App. No. 05AP-1151, 2007-Ohio-377.
 {¶ 21} Testifying at trial on his own behalf, defendant stated that he knew McBride from previous employment and lived with him for three or four weeks when defendant had domestic problems with Yvette Wilks, defendant's girlfriend. Defendant admitted he went to McBride's house on the night of the murder with his cousin, Jimmy Tanner, to obtain a *Page 11 
gun to scare an individual who hit defendant in the head with a tire iron earlier that evening.
 {¶ 22} Defendant testified that McBride let defendant and Tanner in the house; defendant asked McBride for a gun. Defendant and McBride first went upstairs and looked for a gun in a chest of drawers. They proceeded to the basement to see if a shotgun was there. Tanner eventually came down to the basement to look for a gun himself, removed a ceiling tile, and asked McBride what he did with the gun. Defendant and McBride went back upstairs and eventually sat down and started talking. Defendant stated that while he and McBride were talking, Tanner was roaming freely around the house.
 {¶ 23} As the two talked, Tanner came back upstairs and went into the bathroom on the main floor. Defendant and McBride heard what sounded like a drawer being opened. When McBride asked Tanner what he was doing, Tanner became angry, came out of the bathroom, hit McBride across the face and threw him to the floor. According to defendant, McBride got to his feet and ran out the back door. Defendant ran outside after McBride because he "didn't want to get into trouble." (1990 Tr. Vol. V, 63.)
 {¶ 24} McBride ran into his back yard and went over a fence into a side yard; defendant followed. Defendant and McBride got into a scuffle, and both men went down to the ground. When McBride realized it was defendant and not Tanner, McBride asked defendant what was wrong with Tanner. Before defendant could respond, Tanner came around from the side of the house with a small knife and hit McBride in the back. Defendant testified he did not see the actual stabbing; rather, he felt McBride jolt. *Page 12 
 {¶ 25} Defendant turned toward Tanner, and Tanner stated that the "damn knife bent." Id. at 67. Defendant assured McBride he would not let Tanner hurt him. Tanner, however, went back toward the front of the house and returned with two knives. Tanner tried to give one to defendant but defendant refused. "He [Tanner] asked me to kill Mr. McBride. I told him no." Id. at 68-70. Tanner asked defendant a second time to kill McBride; defendant ran to the car, got in, and backed out of the driveway where he ran over a big rock and had to restart the car. At that point, Tanner ran in front of the car and got in the passenger side, still carrying a knife. Defendant testified that after leaving McBride's house, he and Tanner drove around for a while. During that time, Tanner pointed to a microwave oven in the back seat. Tanner wanted money for beer and cigarettes, so defendant gave Tanner five dollars in exchange for the microwave.
 {¶ 26} Defendant testified that he did not try to help McBride because he was afraid of knives after having been stabbed in his arm as a child. Defendant stated he would not have jumped in front of a knife had the victim been his own father. Defendant testified he did not call for help because he was scared and knew he would be linked to what happened. Defendant further added that although he had seen Tanner do some crazy things before, he had never seen Tanner as out of control as he was that night. Defendant denied any involvement in the stabbing and eventual death of McBride. Defendant also denied ransacking McBride's house and robbing him. Defendant testified that during the time he and Tanner were in the house, they never discussed killing him, and when defendant ran out of the house after McBride, the house was intact.
 {¶ 27} On cross-examination, defendant acknowledged that in his post-arrest statement to the detectives, he did not inform them of the scuffle that took place in the *Page 13 
side yard between himself and McBride. Defendant also failed to inform the detectives that Tanner made a second trip to the house and returned with two knives after the first knife bent. Although defendant stated at one point that he and Tanner were at the McBride house for what "would seem like" 10 or 20 minutes, defendant stated at another point that he had "no idea" how long he was at McBride's house that night. (1990 Tr. Vol. V, 132.)
 {¶ 28} Two eyewitnesses testified for the state: (1) Janaia Prysock, McBride's next door neighbor who was 17 at the time, and (2) Bertha Bryant, Prysock's mother and McBride's next door neighbor. Prysock testified she was in her bedroom, located next to McBride's driveway, when she heard moaning coming from McBride's house. Prysock went downstairs to tell Bryant about the noise and, looking out the living room window, observed defendant come out onto McBride's back porch and then reenter the house; defendant did not testify to reentering the house at any point. Prysock next observed Tanner come out of the back door carrying a knife. Prysock testified Tanner went around the side of McBride's house and was out of her sight; Tanner then returned and stood beside a car parked in the driveway. Tanner ran back to the side of the house, returned to the car and drove off with defendant. Prysock testified she noticed blood on defendant's hands and shirt.
 {¶ 29} Bryant testified she returned home from grocery shopping that night around 10:00 or 10:30 p.m. Bryant observed a car, identified as the one defendant was driving, in McBride's driveway. Around 11:30 p.m., Bryant was in her kitchen when Prysock came downstairs and told Bryant she heard McBride moaning. Bryant stated she went to the window where she observed a man run around the front of McBride's house, then to the *Page 14 
side, and then to the back door. Bryant saw the man, identified as Tanner, come out of the house carrying a butcher knife and then run back to the other side of the house. Bryant called the police. After the phone call, she returned to the window and observed another individual, identified as defendant, sitting in the car in the driveway; the interior car was lighted. Bryant testified defendant was looking at his hands and had blood on his hands, face and clothes.
 {¶ 30} Homicide Detective William Eagon testified that every room in McBride's house was ransacked: the furniture was tipped over, a ceiling tile was removed from the basement, and articles were removed from shelves and drawers. Police discovered two knives in a dumpster near the apartment defendant and Wilks shared, where defendant and Tanner eventually stopped after leaving McBride's house. Wilks testified, "I heard Jimmy [Tanner] say I killed the m-f," and Tanner's sister testified that Tanner told her "[t]hat he killed somebody, that they killed somebody." (1990 Tr. Vol. IV, 64, 140.) Tanner's other sister, Michelle, heard defendant and Tanner singing a song about going to Lucasville.
 {¶ 31} Given the other testimony the jury heard, the state contends the new testimony does not create a strong probability of a different outcome on Count 2. The state argues that defendant's version of events remains not credible because other evidence implicates defendant. Specifically, the state relies on the testimony of Prysock and Bryant, as well as the evidence that every room in McBride's house was ransacked. Cumulatively, according to the state, the evidence is sufficient to establish defendant's purpose or intent to kill McBride.Norman, at ¶ 11 (denying defendant's motion for a new trial where witness's revised testimony was impeached at the hearing, and defendant's *Page 15 
testimony was inconsistent in saying both he did and did not intend to injure the victim); State v. Callihan, Scioto App. No. 01CA2815, 2002-Ohio-5878 (holding that witness's recantation of testimony did not justify a new trial for trafficking cocaine where defendant had actual possession of cocaine in a motorcycle he owned, and upon searching his house, police found scales, razor blades, and a plastic bag with cocaine residue); State v. Austin, Hamilton App. No. C-010486, 2002-Ohio-2293 (denying defendant's motion for a new trial where another witness, apart from the recanting witness, identified defendant as the perpetrator).
 {¶ 32} Contrary to the state's contentions, defendant is entitled to a new trial not only on Count 1, but also on Count 2 and the aggravated robbery charge. Norton and Fardal's testimony enhances defendant's credibility as a whole. At the original trial, the timing of the murder was a significant piece of the state's theory. Because of the healing wounds, defendant's testimony that all the knife wounds were inflicted outside McBride's home near the fence was against the physical evidence the state presented. Through Norton's recantation, both Norton and Fardal testified that, based on the irregular pattern and spacing of the wounds, a chain link fence could have caused some of the five wounds located on McBride's right side chest area. As a result, a reasonable juror could conclude defendant testified truthfully in stating McBride went over a fence. Such a conclusion, in turn, could lead to further believing not only that Tanner may have been the only person who inflicted knife wounds to McBride, but that all the wounds may have been inflicted outside McBride's home, in accordance with defendant's testimony. Indeed, if a juror were to determine Fardal's and Norton's testimony corroborates defendant's *Page 16 
version of the events, the same juror may resolve other inconsistencies and credibility issues in favor of defendant.
 {¶ 33} Still, the state argues that because Prysock and Bryant testified defendant had blood on his hands and clothes, he must have been involved in the stabbing. Based on Fardal's and Norton's testimony regarding the fence, McBride may have incurred some of the right chest area wounds when he jumped the fence. If the wounds caused McBride to bleed, and McBride and defendant then got into a scuffle as defendant testified, a juror reasonably could conclude defendant in that process became covered, to some extent, in McBride's blood.
 {¶ 34} Moreover, defendant testified he got blood on his clothes after being hit with the tire iron earlier that evening. Indeed, defendant eventually went to the hospital and received six stitches as a result of the injury. Significantly, neither Prysock nor Bryant, the only two eyewitnesses, testified that defendant was carrying a knife; they observed only Tanner carrying a butcher knife. Consistent with defendant's testimony, Prysock and Bryant also testified they observed Tanner go to the side of the house two different times. Indeed, the testimony of Wilks and Tanner's sister may be construed to implicate Tanner, not defendant.
 {¶ 35} The state also asserts that defendant's version of events is not credible because it does not allow enough time for Tanner to have ransacked the entire house by himself. The state contends its argument is particularly persuasive because defendant testified that the house was intact when he ran outside after McBride. A reasonable juror, however, could conclude that Tanner could ransack McBride's house and kill him in the 10 to 20 minutes defendant estimated they were at the scene. Moreover, although *Page 17 
defendant testified he was at McBride's house for what seemed like 10 or 20 minutes, he was not really sure about the time frame, testifying he "had no idea" how long he was there. (1990 Tr. Vol. V, 132.)
 {¶ 36} According to defendant, Tanner was out of control that night. While McBride's house consisted of three floors, the exhibits indicate it was relatively small. Further, Tanner removed the ceiling tile while defendant and McBride were at the same time in the basement looking for a gun, and he opened drawers while defendant and McBride were talking. According to defendant, Tanner was "roaming around freely" in McBride's house, in addition to the time period after defendant ran out the back door to follow McBride. (Tr. Vol. V, 61.) Significantly, other than the microwave, which defendant stated he bought from Tanner for five dollars, all the items missing from McBride's house were in Tanner's possession.
 {¶ 37} Because the recanted testimony impacts defendant's credibility, the usual test for a new trial of demonstrating a strong probability of a different outcome is difficult to apply. If the jury were to believe defendant because of the recanted testimony, it likely will reach a different result; if it nonetheless were to choose to disbelieve defendant despite the recanted testimony, a jury may conclude that defendant was involved. Even if defendant's testimony contains inconsistencies, the jury may note them and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." State v.Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citingState v. Antill (1964), 176 Ohio St. 61, 67; State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus (holding that determinations of credibility and weight of the testimony remain within the province of the trier of fact). *Page 18 
 {¶ 38} In the final analysis, the recanted testimony affects not only the prior calculation and design element of the charged offenses, but also defendant's credibility generally, to the point of corroborating some of defendant's version of the events the night McBride was murdered. A reasonable juror could conclude the state's "evidence" both fails to demonstrate defendant "purposely" killed McBride and fails to establish that defendant was involved in the stabbing. Had the jury heard Norton and Fardal testify that the fence may have caused some of the wounds, the jury could far more easily have believed defendant's testimony and determined that only Tanner stabbed and robbed McBride.
 {¶ 39} Accordingly, the trial court must retry both aggravated murder charges along with both specifications to each count. Indeed, as a practical matter, we cannot envision how the trial court can conduct a new trial on specification two to Count 2 without having a new trial for Count 2, the crime on which the specification was issued.
 {¶ 40} The trial court also overruled defendant's motion for a new trial on the count charging defendant with aggravated robbery as the principal offender. R.C. 2911.01 provides: "(A) No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it; (2) Have a dangerous ordnance on or about the offender's person or under the offender's control; (3) Inflict, or attempt to inflict, serious physical harm on another."
 {¶ 41} For the same reasons a new trial is necessary on both counts of aggravated murder, a new trial is necessary on the aggravated murder charge. Because *Page 19 
the recanted testimony directly impacts defendant's credibility, defendant's testimony denying that he committed or attempted to commit a theft offense against McBride may be more persuasive to the jury. We further note that although defendant drove himself and Tanner from McBride's house after Tanner apparently stole items from McBride, the jury was not instructed under the complicity statute. See R.C. 2923.03.
 {¶ 42} Accordingly, defendant's first assignment of error is sustained.
IV. Defendant's Fourth Assignment of Error {¶ 43} In the fourth assignment of error, defendant contends the trial court violated defendant protection against double jeopardy in failing to reduce defendant's conviction to murder based on the changed testimony. Defendant's contentions are unpersuasive. Defendant's motion for a new trial pursuant to Crim.R. 33(A)(6) does not give the trial court authority to convict him of a lesser included offense based on newly discovered evidence. Where the new evidence meets the factors set forth in Petro, the remedy is a new trial. Defendant's fourth assignment of error is overruled.
 {¶ 44} Having sustained defendant's first assignment of error, rendering moot his second, third, fifth, and sixth assignments of error, and having overruled his fourth assignment of error, we reverse the judgment of the trial court and remand this matter to the trial court for proceedings consistent with this opinion.
Judgment reversed and case remanded.
 McGRATH and WHITESIDE, JJ., concur.
WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1