[Cite as *State v. T.S.*, 2021-Ohio-2203.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 20AP-159 |
| v. | : | (C.P.C. No. 09CR-4205) |
| [T.S.], | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 29, 2021

**On brief:** [*Janet Grubb*, First Prosecuting Attorney], and *Sheryl L. Prichard,* for appellee. **Argued:** *Sheryl L. Prichard.*

**On brief:** *Harris Law Firm, LLC,* and *Felice L. Harris,* for appellant. **Argued:** *Felice L. Harris.*

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, T.S., who is serving multiple, consecutive terms of life in prison after numerous convictions of rape, sexual battery, and gross sexual imposition of his nine-year-old daughter, appeals from the decision of the Franklin County Court of Common Pleas denying his motion for a new trial under Crim.R. 33. The basis for the motion was the victim's purported recantation of her trial testimony and ineffective assistance of trial counsel. Because the trial court did not err when it disallowed her testimony at the motion hearing or when overruling the motion, we will affirm.

{¶ 2} We adopt the following recitation of facts from our May 24, 2012 opinion resolving T.S.'s first direct appeal:

> On July 15, 2009, appellant was indicted on 17 counts alleging
> he committed numerous sexual acts involving his nine-year-

old daughter, as well as tampering with evidence and disseminating matter harmful to juveniles. The alleged sexual acts occurred between November 5, 2008 and June 28, 2009, and involved acts such as fellatio, cunnilingus, digital vaginal penetration, anal penetration, and sexual contact.

On October 19, 2010, a jury trial commenced. The State of Ohio ("the State") introduced the testimony of appellant's daughter, E.J., E.J.'s mother S.J., and Detective David McGuire, as well as the testimony of forensic interviewer Diane Lampkins, and Mary Ranee Leder, M.D.

E.J., who was almost 11 years old by the time of the trial, testified she lived with her mother, stepfather, older sister, and younger brother in Circleville, Ohio. Prior to moving to Circleville, E.J. testified she had lived in Columbus and visited her father (appellant) every other weekend and after school when he got off work. He usually picked her up at 4:30 p.m. on school nights and then took her home to her mother's house, which was about ten minutes away, at approximately 6:00 p.m. When she stayed at her father's house, she slept downstairs in the basement.

E.J. testified that when she went to visit appellant, he would touch her private parts inappropriately underneath her clothing. E.J. explained appellant touched her on both the inside and the outside of her vagina, as well as inside and outside of her butt. She testified this touching happened more than two times and that it was with his hands or fingers. E.J. also testified appellant made her lick his penis and he put his mouth on her vagina. She testified both of these things happened more than once. In addition, E.J. testified she observed appellant ejaculate when she saw "white stuff" coming out of his penis. (Tr. 38.) Finally, E.J. testified appellant asked her to help give him an enema more than once and he also gave her an enema one time. E.J. further testified all of these acts occurred at her father's house some time after she turned nine years old and that her stepmother was at work when they occurred.

E.J. described a locked black suitcase her father kept in his bedroom which contained items such as a ping-pong paddle they used to smack one another on the butt, magazines and movies displaying naked women and "their private parts," the enema, a dildo, a red cord, a flyswatter, and a tube of KY jelly. (Tr. 40.) She testified appellant used the items in the suitcase when she came to visit. E.J. also testified appellant showed

her videos of naked women on his computer. Additionally, E.J. testified they played a card game on more than one occasion called "21," which required the person whose cards totaled more than 21 to remove an item of clothing.

One day when E.J. was telling a friend about what happened with appellant, E.J.'s older sister overheard the conversation and reported it to their mother, S.J. E.J. eventually told her mother about what had happened with appellant. She testified her mother asked a lot of questions and then called someone who came over to the house and interviewed E.J. E.J. and her mother, stepfather, and two siblings then packed up the car to go on a vacation, but appellant came to the house and began following them, so they drove to the police station. The police then escorted E.J. and her family to Nationwide Children's Hospital. At the hospital, E.J. was interviewed and drew pictures of the black suitcase and its contents. She was also examined by a doctor.

S.J., E.J.'s mother, testified she had known appellant for approximately 13 years. The two of them were romantically involved for approximately two and one-half months and had E.J. as a result of that relationship, but they had remained the best of friends. S.J. testified she and appellant had shared parenting and appellant took care of E.J. almost as much as she did. S.J. testified appellant had E.J. every other weekend and some holidays, but if he had time off work, she would allow him to spend additional time with E.J. S.J. testified she did not think she had any problems in her relationship with appellant.

S.J. testified she learned of what was going on between appellant and E.J. from her older daughter and from E.J.'s friend in June 2009. S.J. could not believe the allegations. The mother of E.J.'s friend threatened to call Franklin County Children's Services, so S.J. called children's services first. A social worker came to the house to interview E.J. During that time, appellant called S.J. several times and wanted to know what was happening. After the interview, as S.J. and her family were leaving the residence, appellant arrived at the house. The family then drove to the police department in order to be escorted to Nationwide Children's Hospital, where E.J. was interviewed and examined.

Diane Lampkins, a forensic interviewer at the child-advocacy center ("CAC") of Nationwide Children's Hospital who interviews children regarding abuse and neglect allegations,

testified she interviewed E.J. During the interview, E.J. disclosed the type of sexual abuse to which she had been exposed. Ms. Lampkins testified E.J. talked about the following: exposure to pornography; anal contact; games involving sexual acts; a box containing secret sex toys; ejaculation; enemas and KY gel; and putting her mouth on appellant's penis. * * *

Ms. Lampkins also testified E.J. described multiple incidents that had occurred with her father and that the incidents had occurred after E.J.'s ninth birthday and had been going on for about six months. Ms. Lampkins originally testified E.J. identified the perpetrator as E.J.'s stepfather, but she later testified E.J. reported her father was the perpetrator.

Dr. Leder, an attending physician at Nationwide Children's Hospital, testified she evaluates children and adolescents who may have been mistreated physically or sexually or who may have been neglected. Her duties include working at the CAC. * * * Dr. Leder testified the general exam was normal, as was the exam of E.J.'s anal and genital areas. Although the examination was normal, Dr. Leder testified a normal exam neither proved nor disproved that E.J. had sexual contact, and that the absence of abnormal findings or injury was consistent with the history provided by E.J., as one would not expect such findings based on the type of contact E.J. had described.

Detective McGuire, a Columbus police detective with the sexual assault unit in the special victims bureau, testified he was assigned to assist in the investigation of the case involving E.J. When he arrived at work on June 29, 2009, Detective McGuire was sent to observe, via television monitor, an interview with E.J., which was already in progress. Based on information obtained from the interview, Detective McGuire acquired a search warrant for appellant's residence at 2635 Youngs Grove Road, in Franklin County, Ohio. Detective McGuire and several other officers went to appellant's residence to interview appellant and to execute the search warrant. Detective McGuire and his partner, Detective Dave Phillips, met appellant and his wife and asked to interview appellant alone. Appellant agreed to speak to the detectives alone. Both detectives possessed active recording devices and recorded their conversation with appellant. Detective McGuire identified a CD of the recorded interview of appellant, which was then played in court for the jury.

The detectives spoke with appellant for approximately 30 to 60 minutes. During that time, appellant was not given Miranda warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). However, appellant was advised that he was not under arrest and that the detectives had no intention of arresting him that night; instead, they just wanted to get his version of events. The detectives informed appellant that they wanted to have an honest interview in order to determine whether the information provided by E.J. was accurate, since frequently these types of cases do not initially produce completely accurate information. They further advised appellant that his willingness to take responsibility and to acknowledge his issues would determine how the case was handled in the court system.

The detectives informed appellant that E.J. alleged certain sexual things had occurred and that she wanted it to stop. Upon questioning, appellant admitted he and E.J. had played the card game "21." He claimed no clothing was ever removed, but he explained to E.J. that if she ever played the game with boys, they would want her to take off her clothing. Appellant also admitted he had previously applied Desitin cream between E.J.'s legs, given her showers when she was younger, and recently washed her hair to make sure it was clean. Appellant stated he may have unintentionally touched her private areas while she was in the shower or while she was in the bed when he was applying the Desitin cream.

During the interview, the detectives repeatedly advised appellant they wanted to get help for E.J. They also advised there was help available for appellant as well, but that appellant first had to acknowledge that he had a problem. Appellant eventually acknowledged he had a problem and asked for help, stating he did not want to go to court or to jail. Appellant advised the detectives his daughter had asked him questions about oral sex and wanted to know how it felt because her sister was taking sex education classes at school and she had books on the subject. Appellant claimed he gave E.J. oral sex one time to answer her questions, and that, unfortunately, it continued to occur.

The detectives informed appellant that they did not believe E.J. was lying about the events she claimed had occurred. They also encouraged appellant to be truthful. Appellant admitted he had made a big mistake and conceded that E.J. had put her mouth on his penis once, and possibly twice. He

stated his wife was at work when these incidents occurred. In response to questioning from the detectives, appellant acknowledged he had a locked briefcase which, at one time, contained items such as magazines, a ping-pong paddle, some KY jelly he and his wife used, and a butt plug. Appellant told the detectives he had gotten rid of the items in the briefcase a few weeks earlier because he knew it was wrong to have them and for E.J. to see them.

During the interview, appellant admitted E.J. had inserted the butt plug into his butt. He conceded he once had E.J. rub his penis with her hand. Another time, he asserted E.J. asked questions about ejaculation because it was in one of her sister's sex education books, so appellant ejaculated in the shower. Appellant also confessed to performing oral sex on E.J. on more than one occasion.

In addition, appellant admitted E.J. observed part of a pornographic movie on his computer when it accidently flashed up on the screen and that she also accidently observed part of a pornographic movie on television. Appellant claimed he got rid of those movies a few months ago. Appellant advised the detectives he did not have an issue with child pornography and that any child pornography on his computer was there as a result of "pop ups."

In response to questioning about playing poker, appellant told the detectives that if he lost the poker game, E.J. was supposed to swat him with the paddle, and if she lost, she was supposed to clean the house naked and appellant was also supposed to be naked. However, appellant asserted that scenario had only been a suggestion and it never actually occurred. Appellant also admitted E.J. gave him an enema. He gave E.J. an enema as well, although he claimed it was for medical purposes, rather than for sexual purposes. Appellant further stated he had never intentionally put his fingers in E.J.'s vagina, but it may have occurred unintentionally when he was applying Desitin cream because she was experiencing irritation in her private area.

After the State finished playing the recorded interview with appellant, Detective McGuire testified that the search warrant was executed following the interview. Appellant also signed a consent to search without a warrant form that was presented to him after his interview. During the search, the black briefcase was recovered from appellant's bedroom. However, as appellant had suggested, it was empty.

> \* \* \*
>
> On October 22, 2010, the jury returned guilty verdicts on all counts except the count charging appellant with tampering with evidence. Thus, appellant was found guilty of 6 counts of rape, 6 counts of sexual battery, and 3 counts of gross sexual imposition.

*State v. Simms*, 10th Dist. No. 10AP-1063, 2012-Ohio-2321, ¶ 2-25.

{¶ 3} T.S. raised five assignments of error in the direct appeal. We sustained two concerning sentencing errors and remanded the case for resentencing. *Id.* at ¶ 62-71. Relevant here is the second assignment of error, in which T.S. asserted that his trial counsel was ineffective for failing to file a motion to suppress his confession. He argued that "the police used a 'ploy' to circumvent his *Miranda* protections by advising him they were there to gather information and stating they were not going to arrest him at that time, yet, failing to advise him prior to the interview that they had already obtained a search warrant to search his residence, predicated on probable cause."[1] *Id.* at ¶ 52. We found "nothing in the record to suggest that the interview was coercive" or that T.S. "was not free to leave or to terminate the interview." *Id.* at ¶ 57. Because "he was not in custody and his statements were voluntary," we concluded that "filing a motion to suppress would have been a futile act" and overruled the assignment of error. *Id.* at ¶ 56, 61.

{¶ 4} After remand, further sentencing errors prompted another appeal and remand. *See State v. Simms*, 10th Dist. No. 13AP-299, 2013-Ohio-5142. The trial court imposed sentences of life imprisonment without parole on 6 counts of rape and 36 months each on 3 counts of gross sexual imposition, with consecutive sentences on 5 of the life sentences. (Apr. 30, 2014 Am. Jgmt. Entry at 3.) The remainder of the convictions, for sexual battery, merged with the rape counts. *Id.* No appeal followed.

{¶ 5} On July 18, 2014, E.J., her mother, and paternal grandmother met with T.S.'s attorney, Tim Pierce, at his office, where E.J. answered questions under oath. Her answers recanted all of the trial testimony that had incriminated her father. She remembered saying "[s]ome" but "[n]ot all" of the things that she had testified to but

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

denied that her father had ever touched her "in a sexual manner at any time." (July 18, 2014 E.J. Dep. at 10.) She denied that her father had ever touched her, exposed himself to her, forced her to perform oral sex on her, shown her a pornographic movie, ejaculated on her, or shown her or engaged in any act involving an enema or a paddle. *Id.* at 11-14. E.J. said that she only saw the contents of the black briefcase once, "but all [she] saw was papers." *Id.* at 13. She had no memory of drawing a picture of the briefcase or its contents at Children's Hospital. *Id.* at 17.

{¶ 6} E.J. said that the prosecutor had "explained to [her], like, what to say really." *Id.* at 18. She explained that she made the allegations because she "didn't want to go over to [her] dad's anymore" because her mom had been "really sick," she "didn't want to leave her," and "it was really boring over there when he lost his job." *Id.* at 19. She claimed that some of the allegations were based on accusations that a friend had made about her own father and that "the other parts came from" the television shows "Family Guy, and Adult Swim, and American Dad, and Special Victims Unit." *Id.* at 19-20. E.J. stated: "I didn't know he was going to go to jail at all. Like, I had no clue. I just thought I was going to be taken away from him and I was just going to stay with mom." *Id.* at 23. She denied that she was lying in order to get her father out of prison. *Id.* at 24. E.J. stated multiple times that no one had forced, coerced, or threatened her in order to recant her trial testimony. *Id.* at 7-8, 25, 31.

{¶ 7} Citing E.J.'s statement, T.S. moved the trial court for leave to file a motion for a new trial under Crim.R. 33. He argued that E.J. had "recanted" her testimony, and that the recantation amounted to new evidence that he had been unavoidably prevented from discovering because it did not exist before trial. (Nov. 20, 2018 Mot. for Leave at 1, 5-6.) After hearing about the recantation and briefly questioning E.J., the trial court appointed counsel to represent her. (Feb. 29, 2019 Tr. at 2-3.)

{¶ 8} At a hearing held on April 25, 2019, E.J.'s counsel appeared and informed the trial court that she would "no longer be recanting her earlier statement to this Court during the jury trial." (Apr. 25, 2019 Tr. at 4.)

{¶ 9} At a subsequent hearing, the trial court granted T.S. leave to file the motion for a new trial and the parties agreed to present evidence on the motion that day. (Oct. 30,

2019 Tr. at 10-11.) When the trial court asked E.J.'s attorney if she was going to testify, he replied that the question had "two answers":

> One, she does not wish to testify. She's horrified of this whole event, absolutely devastated by it.
>
> But from a legal standpoint, I also don't want her to testify because she's certainly got a Fifth Amendment [issue] that I've got to worry about or that she should be worried about, in that I believe she testified to one thing at trial and then signed an affidavit well after that trial to something different.
>
> * * *
>
> THE COURT: So no matter what we do with her, you're going to invoke the Fifth right away?
>
> MR. HUNT: I'm going to ask her to do that, correct.

(Tr. at 4-5.)

{¶ 10} T.S.'s attorney objected, while also conceding that "under case law * * * I can't call someone for the purpose of having them just to invoke the Fifth." (Tr. at 6.) The trial court admitted E.J.'s July 18, 2014 sworn statement recanting her trial testimony. (Tr. at 26.)

{¶ 11} T.S. testified at the hearing and denied that he had ever sexually abused his daughter. (Tr. at 30.) He agreed that he had "made a number of statements" to the police that he had sexually abused E.J., but attributed that to the accumulated effect of "family disputes," "arguments at work," and financial pressures:

> So anyway, with all these other problems and a multitude of other problems and the fact that I'm just wore out from the day, I don't feel like fussing and fight and arguing, and I thought that I could, okay, look, I'm not going to fight and argue. You guys say this happened, it happened. Now I go in, I tell the -- tell the Court's, tell the judge, I'll present the evidence, I'll show that it didn't happen, it couldn't happen.
>
> And the next thing I know I'm in prison for the rest of my life for something I didn't even do.

(Tr. at 37-40.)

{¶ 12} T.S. testified that he felt "pressured by the police," who "wouldn't leave" his house. (Tr. at 40-41.) While being questioned in his home, he noticed "five police cruisers" outside and "about eight police officers" in the front yard. (Tr. at 43.) T.S. testified that he told his trial attorney that he wished to testify on his own behalf. (Tr. at 41-42.) He also stated that he had no ability to contact E.J. and had nothing to do with her recantation of her trial testimony. (Tr. at 44.)

{¶ 13} M.S.S., T.S.'s wife and E.J.'s stepmother, also testified. She stated that T.S. and E.J. "had a very good father-daughter relationship" and that she never witnessed any sexual abuse or inappropriate behavior. (Tr. at 95-96.) M.S.S. had no knowledge of anyone pressuring E.J. to recant her testimony. (Tr. at 101.) She herself "had no relationship" with E.J. or was even in contact with her from the time that T.S.'s trial concluded until 2011, when E.J. recanted her testimony. (Tr. at 101, 120.) M.S.S. had been "present with" E.J. and personally heard her recant. (Tr. at 134.) According to M.S.S., E.J. had been living with T.S.'s mother, but "there was somewhat of a falling out" after the last court date when E.J. said she would no longer recant her trial testimony. (Tr. at 121.)

{¶ 14} T.S.'s mother, N.K., testified that E.J.'s mother contacted her "a long time" after the trial and asked to meet. (Tr. at 146.) Referring to the sexual abuse, E.J.'s mother told N.K. that T.S. "didn't do that," and said that E.J. was "going to take it back." (Tr. at 146.) N.K. accompanied E.J. and her mother when E.J. recanted her trial testimony under oath in 2014. (Tr. at 149-50.) She denied that "anybody put any kind of pressure or was applying pressure or coercing [E.J.] to be there and say the things she did." *Id.*

{¶ 15} N.K. explained that E.J. asked to live with her in 2016, when she was 17. (Tr. at 160.) However, there "were kind of two events" that resulted in E.J. leaving her grandmother's: "She got a puppy, number one. * * * And it grew into a humongous big dog. We didn't have the room for that * * * And then she left also because of the last time she [was in court] and her recant[ing], returning her recant[ing]." (Tr. at 142.) N.K. did not force E.J. out but told her "you do not have to move. You know, we'll just muddle through this somehow." *Id.* E.J. "did not want to go back home because of the drugs and the drinking" at her mother's. *Id.* Even though N.K. did not want E.J. to move out, she did so after her attorney told N.K. and E.J.'s mother that E.J. was no longer going to recant her trial testimony. (Tr. at 159, 163-64.)

{¶ 16} In a post-hearing memorandum, T.S. argued that he was entitled to a new trial for two reasons. First, he argued that E.J.'s July 18, 2014 "credible and reliable" recantation, if admitted at a new trial, would "materially affect its outcome." (Jan. 17, 2020 Post-Hearing Memo. at 7, 11.) Second, T.S. argued that his trial counsel was deficient for failing to call him as a witness, which would have introduced evidence that detectives elicited a false confession from him, and for failing to file a motion to suppress to exclude his incriminating statements. *Id.* at 14-36.

{¶ 17} The trial court denied T.S.'s motion for a new trial. It found that:

> [T]he victim's 2014 deposition in which she purports to recant her trial testimony is not credible and would not materially affect the outcome of the trial. At the time of the deposition, the victim was still a minor and was unrepresented by legal counsel. Additionally, present at the deposition was the *Defendant's* mother who at the time was the victim's source of shelter, money, and transportation. Beyond these inherent issues with the deposition, the Court cannot overlook Defendant's own statements to the police as well as the victim's disclosures to CAC and depictions of sex toys at the tender age of nine. All of which point to the defendant's guilt. Accordingly, the Court finds the 2014 deposition of the victim is insufficient to warrant a new trial.

(Emphasis sic.) (Mar. 12, 2020 Decision and Entry at 3.)

{¶ 18} The trial court also rejected T.S.'s argument that he received ineffective assistance of counsel because "this issue was already raised and rejected on direct appeal." *Id.*

{¶ 19} T.S. appeals from the denial of his motion for a new trial and assigns the following as error:

> [I.] The trial court erred in quashing [T.S.'s] subpoena and preventing E.J. from taking the witness stand.
>
> [II.] The trial court abused its discretion when it denied [T.S.'s] Motion for New Trial.

{¶ 20} In support of the first assignment of error, T.S. argues that his "rights to due process, a fair hearing, compulsory process, and right to confront the witnesses against him pursuant to Article I, Section 10 of the Ohio Constitution and the Fifth and Six[th] Amendments to the United States Constitution were denied when the trial court

prevented E.J. from being called as a witness." (Appellant's Brief at 15.) Citing *Columbus v. Cooper*, 49 Ohio St.3d 42, 46 (1990), which held that "pursuant to the Compulsory Process Clause of Section 10, Article I of the Ohio Constitution, a trial court may not exclude a person who has previously asserted his right against self-incrimination from appearing as a witness on behalf of a criminal defendant," he argues that E.J. was required to take the stand and personally assert her Fifth Amendment right against self-incrimination. He acknowledges that the Supreme Court of Ohio "limited and distinguished" *Cooper* in *State v. Kirk*, 72 Ohio St.3d 564, 565 (1995). (Appellant's Brief at 20.) *Kirk* held: "A trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination." *Id.* at paragraph one of the syllabus.

{¶ 21} This holding does not apply, T.S. argues, because in *Kirk* "the trial court inquired of the witness's attorney, personally addressed the witness, and advised the witness of the subject matter to be asked, if he were called by the defense." (Appellant's Brief at 20.) In contrast, T.S. does not believe the trial court took the steps he deems necessary under *Kirk* to excuse calling E.J. as a witness. (Appellant's Brief at 21.) He points to the exchange between E.J.'s attorney and the trial court, during which her attorney stated both that E.J. did "not wish to testify" and that he did not "want her to testify because she's certainly got a Fifth Amendment" problem. (Appellant's Brief at 16.) T.S. argues that this exchange reflects only her attorney's "intentions," not E.J.'s: "Counsel did not state [that] E.J. intended to invoke her Fifth Amendment rights and the record bears no testimony from E.J." *Id.* However, he concedes that the following exchange also occurred:

> COURT: Okay. It was represented to us that her intention was to take the Fifth on the stand. Is that correct, Mr. Hunt?
>
> Mr. Hunt: That's correct, Your Honor.

(Oct. 30, 2019 Tr. at 20.)

{¶ 22} According to T.S., there is an "apparent discrepancy" between the foregoing exchange and the attorney's "earlier statements," and the record therefore does "not reflect E.J.'s intention to invoke her privilege against self-incrimination." (Emphasis sic.)

(Appellant's Brief at 17.) He believes that trial court's exclusion of E.J. as a witness "effectively denied" him of his "rights to due process and a fair hearing, right to compulsory process and right to confront the witnesses against him, in violation of Article I, Section 10 of the Ohio Constitution and the Fifth and Sixth Amendments to the United States Constitution." (Appellant's Brief at 24.)

{¶ 23} The premise underlying T.S.'s argument is that these federal and state constitutional rights apply in a hearing on a motion for a new trial with the same force that they do during a criminal trial. There is scant authority to support this position, even within the text of the constitutional clauses themselves. The rights "to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf," as stated in Article I, Section 10 of the Ohio Constitution, apply "[i]n any *trial*, in any court," but that is not the same as any hearing, in any court. (Emphasis added.) Likewise, a defendant's Sixth Amendment rights "to be confronted with the witnesses against him [and] to have compulsory process for obtaining witnesses in his favor" apply "[i]n all criminal prosecutions," but by definition, a motion for a new trial is filed after the conclusion of a criminal prosecution. *See* Crim.R. 33(B) (allowing filing of motion, in all cases, only "after the verdict was rendered").

{¶ 24} Ohio appellate courts have not sympathetically viewed claims that a defendant enjoys full compulsory process and confrontation rights after the trial concludes. The Seventh District Court of Appeals rejected the argument that the Ohio Constitution and the Sixth Amendment gave a defendant the right to subpoena witnesses at her sentencing, holding that "the right of compulsory process is a trial right and may not be invoked at the sentencing hearing." *State v. Irwin*, 7th Dist. No. 09 MA 137, 2011-Ohio-999, ¶ 47, citing *State v. Clark*, 7th Dist. No. 07-MA-87, 2008-Ohio-1179, ¶ 59. *See also Irwin v. Trim*, N.D. Ohio No. 4:12CV0420 (Oct. 3, 2013) (denying *Irwin* defendant's petition for a writ of habeas corpus and rejecting argument that the state court ruling was contrary to federal law, noting that "[t]he Supreme Court does not appear to have ruled on whether a convicted, non-capital defendant has the right to compulsory process of witnesses at a sentencing hearing"). In *State v. Gilbert*, 8th Dist. No. 106358, 2018-Ohio-3789, ¶ 12, the Eighth District Court of Appeals found no merit to the defendant's argument that barring him from the hearing on the motion for a new trial during the

questioning of one witness violated "his confrontational rights under the Sixth Amendment and his due process rights." The Third District Court of Appeals held that "there is no constitutional requirement that the defendant be allowed to cross-examine in a hearing on a motion for new trial." *State v. Lightle*, 3d Dist. No. 2-89-4 (May 1, 1991). The Ninth District Court of Appeals held that a trial court did not violate a defendant's rights to compulsory process or to confront witnesses when it refused to allow testimony from his victim at a hearing on his motion for a new trial. *State v. Cureton*, 9th Dist. No. 03CA0009-M, 2003-Ohio-6010, ¶ 30-33.[2] The federal court hearing the *Cureton* defendant's petition for a writ of habeas corpus rejected his argument as well, ruling that the Sixth Amendment right of confrontation "does not apply to a post-conviction hearing on a motion." *Cureton v. Wilson*, N.D. Ohio No. 1:05CV06232006 (June 22, 2006). *See also United States v. Sawyer*, E.D. Cal. No. S-02-0468 MCE (July 18, 2006) (stating that there was "some suggestion in the law" that defendant's alleged "Sixth Amendment and Fourteenth Amendment right to present witnesses in his favor at the hearing on the motion for a new trial" did "not extend to proceedings other than trial," but that ruling on alleged co-conspirator's motion to quash did not require resolving "this question.").

{¶ 25} In our own cases, we have reversed a trial court on non-constitutional grounds for the manner in which it conducted a hearing on a motion for a new trial. *See State v. Broady*, 41 Ohio App.2d 17, 24 (10th Dist.1974) (trial court abused its discretion when it "thwarted" defendant's efforts to present evidence necessary "for a proper evaluation of his motion for a new trial upon the grounds of newly-discovered evidence" by denying immunity under former version of R.C. 2945.44 to alibi witness who invoked

---

[2] In *Cureton*, the Ninth District Court of Appeals reasoned that, because "post-conviction relief proceedings are civil in nature," the defendant had "no Sixth Amendment rights at a post-conviction hearing" on a motion for a new trial. This conflates two types of postconviction proceedings: a Crim.R. 33 hearing on a motion for a new trial and proceedings under R.C. 2953.21, the civil postconviction relief statute. *See State v. Scudder*, 131 Ohio App.3d 470, 473-74 (10th Dist.1998) (holding that petitioner had no "Sixth Amendment right to the effective assistance of counsel" or to appointed counsel because proceeding under R.C. 2953.21 was civil). The Supreme Court of Ohio has cautioned that a rule-based remedy, which "is filed in the underlying criminal case," is distinct from a civil one arising under the postconviction relief statute. *State v. Bush*, 96 Ohio St.3d 235, 2002-Ohio-3993, ¶ 13, quoting *State v. Calhoun*, 86 Ohio St.3d 279, 281 (1999) ("Given that a postsentence Crim.R. 32.1 motion is not collateral but is filed in the underlying criminal case and that it targets the withdrawal of a *plea*, it is not a 'collateral challenge to the validity of a *conviction or sentence*.' ") (emphasis sic). Thus, contrary to the reasoning of *Cureton*, a remedy arising under the Criminal Rules is decidedly not civil in nature.

his Fifth Amendment). We have also held that a trial court that did not grant a new trial, but instead "opened up the case for additional piecemeal evidence," then "again found the defendant guilty" without actually conducting a new trial, amounted to a denial of due process. *State v. Jones*, 10th Dist. No. 77AP-436 (Dec. 6, 1977). And where a defendant argued that "his right to compulsory process was violated" at a hearing on a motion for a new trial because "the trial court refused to allow [the victim] to testify on his behalf," we overruled the assignment of error only because the defendant "never attempted to exercise his right to compulsory process." *State v. Henderson*, 10th Dist. No. 97APA04-551 (Sep. 16, 1997). Unlike the other appellate courts in *Irwin, Gilbert, Lightle,* and *Cureton*, we did not question the underlying assumption concerning the existence of the right in a postconviction hearing on a motion for a new trial.

{¶ 26} Nevertheless, this case does not require us to define the precise contours of these rights during hearing on a motion for a new trial. Even assuming for the sake of argument only that they apply as robustly in a hearing on a motion for a new trial as they do during a criminal trial, they would not have entitled T.S. to force E.J. onto the witness stand simply to invoke her Fifth Amendment privilege against self-incrimination. The Supreme Court of Ohio's decision in *Kirk* requires this conclusion.

{¶ 27} In *Kirk*, the defendant was convicted of voluntary manslaughter for shooting a victim during a bar fight. 72 Ohio St.3d at 565-66. The defendant attempted to call a witness who had fought with the victim immediately before the shooting, but the witness' attorney informed the trial court "that he had advised [the witness] not to testify." *Id.* at 566. The trial court "personally addressed" the witness and told him that "he would be asked questions dealing with the events involving the death" of the victim, that "anything he said about those events could be used in any future indictment against him," and that "he had a Fifth Amendment right not to answer questions * * * if he believed the answers would incriminate him." *Id.* at 566-67. The witness advised the trial court that "he would assert his Fifth Amendment privilege" if called to the stand, but the defense still wanted to call him: "not to demonstrate that he would assert his Fifth Amendment privilege, but to have [the witness] testify. Defense counsel's intent was to prevent the jury from drawing any adverse inferences from any defense failure to call [the witness] to the stand." *Id.* at 567. The trial court excused the witness, "ruling that no party

should call a witness to demonstrate that he would exercise his Fifth Amendment rights." *Id.* The defendant appealed, asserting a violation of his right to compulsory process. *Id.*

{¶ 28} In affirming the trial court, the Supreme Court of Ohio distinguished its previous holding in *Columbus v. Cooper*, 49 Ohio St.3d 42 (1990), paragraph one of the syllabus, that "[p]ursuant to the Compulsory Process Clause of Section 10, Article I of the Ohio Constitution, a trial court may not exclude a person who has previously asserted his right against self-incrimination from appearing as a witness on behalf of a criminal defendant at trial." *Kirk* expressly "limited" *Cooper* when it held: "A trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination." *Kirk* at paragraph one of the syllabus.

{¶ 29} According to the court, the "essential difference" between the two cases was the intention of the witnesses. *Id.* at 568. In *Cooper*, the trial court advised the witness of his Fifth Amendment right and appointed an attorney to consult with him. *Kirk* at 567, explaining *Cooper*, 42 Ohio St.3d at 42. Still, the witness "agreed to testify" and answer some questions. *Id.* In *Kirk*, however, the witness "did not intend to testify at all." *Id.* at 568.

{¶ 30} Here, as well, E.J. did not intend to testify at all. The trial court personally addressed her and appointed an attorney to represent her as soon as it was informed of her recantation. (Feb. 29, 2019 Tr. at 2-4.) E.J.'s attorney later informed the trial court that she did "not wish to testify" and would exercise her Fifth Amendment right if called to the stand. (Oct. 30, 2019 Tr. at 4-5, 20.) As in *Kirk*, T.S. "did not have a right to place [E.J.] on the stand for the sole purpose of" hearing her invoke the Fifth Amendment.[3] *Kirk* at 569. *See also State v. Chatman*, 10th Dist. No. 08AP-803, 2009-Ohio-2504, ¶ 45

---

[3] The remedy that *Kirk* provides, of "an instruction that the jury should draw no inference from the absence of the witness because the witness was not available to either side," which "is intended to reduce the danger that the jury would, in fact, draw an inference from the absence of a witness who could corroborate defendant's testimony," does not apply at a hearing on a motion for a new trial. *Id.* In this context, the judge is both the factfinder and is presumed to follow the law. *In re Disqualification of Nichols*, 74 Ohio St.3d 1215 (1989) (because "[a] judge is presumed to follow the applicable law in all respects," it is also "presumed that a judge will follow the law in ruling upon a motion for a new trial when that same judge presided during the original trial"); *State v. Meek*, 10th Dist. No. 16AP-549, 2017-Ohio-9258, ¶ 28 (noting that the trial court is "the finder of fact on [a] motion for new trial").

("there is no 'right' of a defendant to call a witness solely for the purpose of invoking his or her Fifth Amendment rights").

{¶ 31} Finally, we reject T.S.'s argument that the record does "not reflect E.J.'s intention to invoke her privilege against self-incrimination" due to "apparent discrepanc[ies]" he perceives in the statements of her attorney to the trial court. (Emphasis sic.) (Appellant's Brief at 17.) E.J.'s attorney represented to the trial court that: (1) she did not wish to testify; (2) he had advised her not to testify; and (3) E.J.'s "intention was to take the Fifth on the stand" if called. (Oct. 30, 2019 Tr. at 4-5, 20.) These representations were not only consistent, they were more than adequate for the trial court to satisfy *Kirk*'s requirement that it determine "that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination." *Id.* at paragraph one of the syllabus. *See also State v. Spangler*, 5th Dist. No. 16-CA-12, 2017-Ohio-268, ¶ 36 (holding that "the trial court conducted a sufficient inquiry" under *Kirk* where the witness "was not directly subject to the trial court's inquiry," but her "interests were represented by her appointed counsel"). The first assignment of error is overruled.

{¶ 32} The second assignment of error posits that the trial court abused its discretion when it denied T.S.'s motion for a new trial under Crim.R. 33. He argues that the trial court did not "properly assess" the credibility of E.J.'s recantation. (Appellant's Brief at 26.) He points to the trial court's "factually incorrect belief" that E.J. was financially dependent on her paternal grandmother at the time of the recantation and believes that the trial court discounted the "uncontroverted testimony" that she "did not appear coerced or manipulated" when she recanted her trial testimony. *Id.* at 27-28. In addition, T.S. argued that the trial court "did not properly consider" any of the factors stated in *Calhoun*, 86 Ohio St.3d at 285, that determine the credibility of an affidavit offered in support of a motion for a new trial. *Id.* at 30-31.

{¶ 33} We review a trial court ruling on a motion for a new trial based on newly discovered evidence under Crim.R. 33 for an abuse of discretion. *State v. Schiebel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus. Under this "deferential" standard of review, reversal is not justified "simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning

process than by the countervailing arguments." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14. Rather, the appellate court must conclude that the trial court's ruling "lacks a 'sound reasoning process.' " *Id.*, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). An abuse of discretion is also an "unreasonable, arbitrary, or unconscionable" ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1982).

{¶ 34} A motion for a new trial may be granted "when new evidence material to the defense is discovered, which the defendant could not with reasonable diligence have discovered and produced at the trial." Crim.R. 33(A)(6). To prevail, the defendant must provide new evidence that "(1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505 (1947), syllabus. *See also State v. Burke*, 10th Dist. No. 06AP-686, 2007-Ohio-1810, ¶ 17 (applying *Petro*).

{¶ 35} "A witness's recantation of testimony can be newly discovered evidence if the court finds the new testimony credible and if the new testimony would materially affect the outcome of the trial." *State v. Woodward*, 10th Dist. No. 08AP-1015, 2009-Ohio-4213, ¶ 20, citing *State v. Burke*, 10th Dist. No. 06AP-686, 2007-Ohio-1810, ¶ 18. However, "[c]ourts view newly discovered evidence purportedly recanting testimony given at trial with utmost suspicion." *State v. Meek*, 10th Dist. No. 16AP-549, 2017-Ohio-9258, ¶ 22, citing *Taylor v. Ross*, 150 Ohio St. 448 (1948), paragraph three of the syllabus. "Recanting affidavits and witnesses are viewed with extreme suspicion because the witness, by making contradictory statements, either lied at trial, or in the current testimony, or both times." *State v. Gray*, 8th Dist. No. 92646, 2010-Ohio-11, ¶ 29, citing *State v. Jones*, 10th Dist. No. 06AP-62, 2006-Ohio-5953, ¶ 25.

{¶ 36} We have previously assessed the credibility of an affidavit submitted in support of a new trial by applying the factors set forth in *Calhoun* at 285. *State v. Lee*, 10th Dist. No. 05AP-229, 2005-Ohio-6374, ¶ 14, applying *State v. Coleman*, 2d Dist. No. 04CA43, 2005-Ohio-3874, ¶ 25 (holding that *Calhoun*'s analysis of affidavits supporting petitions for postconviction relief "comfortably applies to affidavits submitted in support

of a motion for a new trial"). Under *Calhoun*, a trial court "should consider all relevant factors" when assessing the credibility of a supporting affidavit:

> Among those factors are (1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial.

*Id.* at 285.

{¶ 37} In this case, the trial court's reasoning satisfied the relevant *Calhoun* factors. The trial court had also presided over T.S.'s trial, so its analysis of E.J.'s credibility was informed by that experience. With regard to the fourth factor, E.J. was T.S.'s daughter, and the trial court viewed with suspicion the fact that her paternal grandmother was present at the time she made her recantation. We agree with T.S. that the trial court's observation that E.J.'s grandmother "at the time [of the recantation] was the victim's source of shelter, money, and transportation" was not supported by N.K.'s testimony at the hearing. *Compare* Mar. 12, 2020 Decision and Entry at 2 *with* Oct. 30, 2019 Tr. at 160. But the trial court emphasized the fact that N.K. was "present" during the recantation, and E.J. was "still a minor and was unrepresented by legal counsel." (Mar. 12, 2020 Decision and Entry at 2.) T.S. emphasizes the lack of evidence of coercion, but the trial court was justified in doubting the credibility of the recantation. Once E.J. was no longer a minor, had her own attorney, and was counseled out of the presence of her mother and grandmother, she no longer wished to recant. The trial court's reasoning was not unsound or unreasonable when it discounted the credibility of the recantation.

{¶ 38} Finally, we note that the trial court did not abuse its discretion under *Petro* when denying the motion for a new trial. The evidence did not create a "strong probability" of a different outcome at a new trial. *Petro* at syllabus. The trial court noted the incriminating effect of "Defendant's own statements to the police as well as the victim's disclosures to CAC and depictions of sex toys at the tender age of nine." (Mar. 12, 2020 Decision and Entry at 3.) In other words, there was strong evidence of guilt independent of the victim's testimony. The admissibility of these statements was affirmed

in the direct appeal of T.S.'s convictions. *Simms*, 2012-Ohio-2321, at ¶ 61. Given the inevitable introduction of the evidence cited by the trial court against T.S. in a new trial, it is impossible to conclude that there is a strong possibility of a different outcome. The trial court did not abuse its discretion when overruling the motion for a new trial. The second assignment of error is overruled.

{¶ 39} Having overruled both assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, P.J. and BROGAN, J., concur.

BROGAN, J., retired, of the Second Appellate District, assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).

_____