[Cite as *State v. Black*, 2025-Ohio-5596.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 24AP-594 |
| | | (M.C. No. 2016 CRB 7169) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Robert N. Black, III, | : | |
| Defendant-Appellant. | : | |
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 24AP-595 |
| | | (M.C. No. 2015 CRB 30259) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Robert N. Black, III, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 16, 2025

**On brief:** *Zachary M. Klein*, City Attorney, *Melanie R. Tobias-Hunter*, *Dave Pelletier*, and *Ryan M. Pelfrey*, for appellee. **Argued:** *Ryan M. Pelfrey*.

**On brief:** *Carpenter Lipps LLP*, *Kort Gatterdam*, and *Michael Rogers*, for appellant. **Argued:** *Kort Gatterdam*.

APPEALS from the Franklin County Municipal Court

JAMISON, P.J.

{¶ 1} Defendant-appellant, Robert N. Black, III, appeals the June 26, 2024 judgment of the Franklin County Municipal Court, which denied his motions for a new trial. That motion was filed some six and a half years after this court's decision affirming his

convictions in two different but related cases of misdemeanor domestic assault. *See generally State v. Black*, 2017-Ohio-3001 (10th Dist.). Notwithstanding this court's prior affirmance and Black's completion of the sentences for those cases, Black filed a motion for leave to file motions for a new trial in both cases. The trial court granted both motions over the plaintiff-appellee, State of Ohio's, objections, consolidated the cases, and set Black's motions for a new trial for an evidentiary hearing. Following that hearing, the trial court issued a 13-page written decision denying both motions for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} In *State v. Black*, 2017-Ohio-3001 (10th Dist.), this court did not describe the facts underlying either conviction, stating only that in both complaints Black was charged with "assault[ing] his father," that "[a]t trial the state presented evidence demonstrating that on both December 31, 2015 and April 2, 2016, Black assaulted his father," and that "[f]ollowing deliberations, the jury found Black guilty as charged." *Id.* at ¶ 2, 4.

## II. ASSIGNMENT OF ERROR

{¶ 3} Black assigns the following as trial court error:

> THE TRIAL COURT ERRED IN DENYING BLACK'S MOTION FOR A NEW TRIAL. SAID ERROR DENIED BLACK HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS.

## III. STANDARD OF REVIEW

{¶ 4} To prevail on a Crim.R. 33 motion for a new trial, the defendant-movant "must show that the newly discovered evidence upon which the motion is based: (1) discloses a strong probability that it will change the result if a new trial is granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence." *State v. Dixon*, 2018-Ohio-4841, ¶ 13 (10th Dist.), citing *State v. Davis*, 2004-Ohio-6065, ¶ 7 (10th Dist.), and *State v. Petro*, 148 Ohio St. 505 (1947), paragraph one of the syllabus. New trials should not be granted lightly. *Dixon* at ¶ 14, citing *State v. Townsend*, 2008-Ohio-6518, ¶ 12 (10th Dist.). And the appellate court's review of a trial court's decision

resolving a motion for a new trial is limited to whether the trial court abused its discretion. *Dixon* at ¶ 16, citing *State v. Hawkins*, 66 Ohio St.3d 339, 350 (1993).

## IV.  LEGAL ANALYSIS

{¶ 5}  In an affidavit attached to Black's motion for leave to file a motion for new trial, Black's father, R.B., stated:

> 2. I was the alleged victim in the above captioned cases. I testified against my son Robert Nathaniel Black, III (Bobby), the Defendant.
>
> 3. My testimony was not truthful.
>
> 4. The first incident occurred on or about December 31, 2015. My son Bobby and his brother Austin, wanted to go to a party at Bobby's girlfriend's house in Pittsburgh. Bobby needed some money for the trip. When I arrived home, I observed that, in my opinion, Bobby was intoxicated. I did not think it was a good idea for him and his brother to travel from Columbus to Pittsburgh in Bobby's condition. I told Bobby I would not be providing him the money he needed for the trip.
>
> 5. After I refused to provide Bobby the money, he and I argued. My testimony about what happened during the argument is summarized in pages 59 and 60 of the trial transcript. My testimony was not accurate. Bobby was loud and profane about me deciding not to give [him] the money to go to the party. However, he did not punch or grab me, and he did not bear hug me at all during the argument. At no point did we go to the ground. My testimony stating that he had done this before was not true. Bobby has never punched me or bear hugged me and we have never wrestled on the ground. The argument continued into the house and garage. We did lock Bobby out of the house, but he was not wrestling me or on top of me at any time. I reiterate, Bobby did not assault me or commit an act of domestic violence during this incident.
>
> 6. The second incident happened on April 2, 2016. My daughter was getting married and she had a function for the wedding away from our house. After the function, everyone returned to our house. Bobby was present and I again observed him to be intoxicated. I believed he was aggravating the guests in our house, including the groom Wayne.
>
> 7. Bobby and his brother Austin were about to get into a physical confrontation. I testified on page 66 of the transcript that Bobby grabbed me and started hitting me with fists and

that the altercation went through the house and into the driveway. Truthfully, Bobby did not hit me or deliver any blows to me during the incident. When he and his brother were fighting, myself and several guests tried to stop the altercation. Bobby went outside and sought to continue the fight with his brother. For a time, we would not let Bobby back in the house. When he was finally let back in, he never hit me or any of the guests. I was not assaulted by Bobby during this incident nor did he commit an act of domestic violence against me.

8. My testimony about physical pain and injuries to my leg and groin after the second incident was not true. On page 73 I testified to blood being on my sport coat and that it was my blood. The only person that was bleeding was Bobby. He was bleeding from his mouth where his brother Austin hit him. His blood ended up on my clothes when I tried to separate Bobby and Austin.

9. On page 86 I testified Bobby had struck me many times before. That is not true. Bobby has never struck me before that I can recall.

10. Bobby had a drinking problem and was taking his life off track and I thought having him charged would make him take some accountability. After discussing resolutions with the prosecutor, I thought Bobby would plead to a minor misdemeanor and it would be removed/expunged later. I thought this would be a good lesson for him and get him back on track. I wanted him to take accountability for his drinking and being disruptive to the family. I did not expect Bobby to refuse the plea bargain and go to trial.

11. Bobby has never been physically aggressive towards me or his family members. I regret that I testified otherwise during his trial.

(Nov. 16, 2023 Def.'s Mot. for Leave to File Mot. for New Trial, Ex. B, Aff. of [R.B.])

{¶ 6} Subsequently, R.B. filed a second affidavit in which he further stated:

I stand by what I said in the September 6, 2023 letter and November 9, 2023 affidavit. My testimony at Bobby's trial was not the truth. I have been unwilling to admit I lied until early 2023 when we started talking about the trial. Knowing that my actions are affecting my son's ability to earn a living and start a family caused me to agree to come forward. Previously, I was unwilling to do so.

(Jan. 22, 2024 Reply in Support of Def.'s Mot. for Leave to File Mot. for New Trial, Ex. C, Aff. of [R.B.])

{¶ 7}    R.B. was not present and did not testify at the oral hearing on Black's motions for a new trial.  Instead, only a single witness testified: Black's mother, M.B., who was present for both incidents but did not testify at Black's original trial.  M.B. testified that Black had not hit R.B. in either incident and that R.B.'s trial testimony was not true.  When questioned about the written statement she gave to the police regarding the first incident, in which she asserted that Black "began threatening to destroy things and threatened to hit," that Black and R.B. were both "on the floor," and that Black was "assaultive toward his father," she stated that "if they tussle and shove, evidently they must have fallen down in the shoving.  I got between them, got them up, grabbed [Black].  And I'm the one who put him outside." (May 9, 2024 Tr. at 45, 48.)  She testified that she grabbed Black and led him out of the house "by his jewels," that she locked him out, and that he picked up a pot and threatened to throw it through the glass door.  *Id.* at 36.  Regarding the second incident, she testified that her younger son had hit R.B., that she did not see what happened outside, and that she did not see Black strike R.B.  As for R.B.'s absence at the hearing, M.B. testified that "within the last month, she noticed that R.B. was 'forgetting things' which prevented him from testifying . . . [but that R.B] did not have any memory problems when he was reviewing his affidavits . . . [and] that R.B.'s memory issues were 'not any more than mine . . .' " M.B. also stated that after an evaluation, R.B.'s primary care physician had not diagnosed him with dementia.  (July 25, 2024 Findings of Fact & Conclusions of Law at 7-8, quoting Tr. at 24, 62.)

{¶ 8}    Following the evidentiary hearing, the trial court "reviewed the trial transcript, the transcript of the hearing on the motion for a new trial, affidavits, exhibits, counsel's arguments, and relevant law regarding Black's motion for a new trial," and summarized the evidence as follows:

> On December 31, 2015, [Black's father,] R.B.[,] wrote a statement to police stating that Black wanted to go to Pittsburgh, Pennsylvania to attend a party with his girlfriend's family and needed money. He would take the trip with his younger brother who has a car. When R.B. did not give Black money, R.B. wrote that Black "became violent, beating me with his fist and throwing me down on the house floor and garage floor for probably 20 to 30 minutes. I call[ed] 911 and managed

to get him outside of the house. He proceeded to make threats, threaten[ing] to throw a ceramic floor pot into the glass kitchen door. He continued to make threats, banging the windows and doors, threatening his mother as well. Police arrived." (State's Exhibit 1; Trial Tr. pp. 93-94; Tr. 5-9-24, pp. 39-41).

R.B.'s testimony at trial was consistent with his written statement. At trial, R.B. testified that on December 31, 2015, Black asked R.B. for money because he wanted attend [sic] a birthday party for his girlfriend's family in Pittsburgh. (Trial Tr. p. 52). Black's brother had a car and would drive him. (Trial Tr. pp. 48, 54-55). R.B. refused to give Black money because Black was "far too intoxicated to go." (Trial Tr. pp. 55, 58). R.B. testified that Black "immediately began to combat, fight, fists, spit, jumped on me, created quite a bit of commotion, started an absolute physical assault." (Trial Tr. p. 59). Black "punched, grabbed me, bear-hugged me, punched me continually, punched me in the face with mostly the right fist; and he continued to do that for some time." (Trial Tr. p. 59). Black took R.B. to the ground. (Trial Tr. p. 59). R.B.'s wife tried to get Black off of R.B. (Trial Tr. p. 60). R.B. was able to get Black off of him and into the garage. (Trial Tr. p. 60). R.B.'s wife locked the door so Black could not come back into the house. (Trial Tr. p. 60). Black picked up a large ceramic outdoor pot and prepared to throw it through the glass kitchen door. (Trial Tr. pp. 60-61). R.B. called the police who arrived and arrested Black. (Trial Tr. pp. 61-62).

. . .

On April 2, 2016, R.B. wrote a statement to police stating, "My eldest son, Robert N. Black, III, physically assaulted me for no apparent reason with punches to my face and body. He also punched way future son-in-law Wayne [], who was visiting with my daughter for her and his wedding reception. Police were called." (State's Exhibit 3; Trial Tr. p. 91; Tr. 5-9-2024, pp. 55-56).

R.B. testified at trial that on April 2, 2016, he held a pre-wedding reception at his house for his daughter and son-in-law. (Trial Tr. pp. 63-64). Black was intoxicated and aggravating the guests. (Trial Tr. p. 65). R.B.'s other son, Austin, punched Black in the face because Black was bothering him. (Trial Tr. p. 66). R.B. stepped in between Black and Austin to separate them. (Trial Tr. pp. 66-67). R.B. testified that Black "started fighting me . . . mostly fists and grabbing me and wresting [sic] with me." (Trial Tr. p. 68). Black struck R.B. in the face with his fists. (Trial Tr. p. 68). R.B.'s son-in-law and

> brother-in-law attempted to get Black under control. (Trial Tr. pp. 68-69). Black also had a "physical confrontation" with Wayne, R.B.'s son-in-law, and both Black and Wayne were going at it." (Trial Tr. pp. 66, 68). R.B. called the police and they arrested Black. (Trial Tr. pp. 69-70).

(July 25, 2024 Findings of Fact & Conclusions of Law at 3-4.)

{¶ 9} Based on the evidence presented, the trial court found that R.B. did not testify at the new trial hearing, that R.B.'s trial testimony was credible, that R.B.'s affidavits and the recantations therein were not credible, that M.B.'s testimony at the hearing that Black did not assault R.B. was not credible, and that Black had failed to meet his burden to establish that the new evidence created a strong probability that the result would change if a new trial was ordered. Accordingly, the trial court denied the motions.

{¶ 10} This court held in *State v. T.S.*, 2021-Ohio-2203 (10th Dist.), that it was appropriate for a judge reviewing the credibility of the affidavit of a recanting witness attached to a motion for a new trial to use the factors set forth by the Supreme Court of Ohio in *State v. Calhoun*, 1999-Ohio-102, to assess the credibility of the claims made in such an affidavit:

> Among those factors are (1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial.

*T.S.* at ¶ 36, quoting *Calhoun* at ¶ 21. The *Calhoun* court also held that "one or more of these or other factors may be sufficient to justify the conclusion that an affidavit asserting information outside the record lacks credibility," and that "[s]uch a decision should be within the discretion of the trial court." *Calhoun* at ¶ 22. Moreover, in *T.S.* we noted that "[c]ourts view newly discovered evidence purportedly recanting testimony given at trial with utmost suspicion . . . because the witness, by making contradictory statements, either lied at trial, or in the current testimony, or both times." (Internal quotation marks deleted and citations omitted.) *T.S.* at ¶ 35.

{¶ 11} Here, Black argues that the trial court erred as a matter of law because R.B. had completely recanted the testimony that formed the basis of Black's convictions. But we observe that, applying the *Calhoun* factors, the hearing on the motions for a new trial was presided over by the same judge who had conducted the trial, and the affiant was Black's father, R.B. Moreover, the trial court observed that R.B.'s trial testimony was consistent with written statements he gave police at the time of the incidents, and that "R.B.'s affidavits do not state that his written statements were not truthful." (Findings of Fact & Conclusions of Law at 10.) In sum, when applying the *Calhoun* analysis to this case, the trial court stated that it was "familiar with the details of this case, heard R.B. testify, and had an opportunity to assess his demeanor and credibility at trial. *This Court finds that R.B.'s testimony at trial that Black assaulted [R.B.] to be credible.*" (Emphasis added.) *Id.* at 10. This determination was within the trial court's discretion.

{¶ 12} Moreover, in its further application of the *Petro* test, the trial court observed that Black's mother M.B. had provided similar written statements to the police in which she had claimed that "Black became 'assaultive towards his father,' " despite her claims at the hearing. (Findings of Fact & Conclusions of Law at 10, quoting Tr. at 45.) The trial court concluded that M.B.'s hearing testimony was not credible, in part because as his mother, she had a strong interest in supporting Black's efforts:

> [M.B.] testified that Black told her that his domestic violence convictions had a negative impact on his employment because a background check revealed his criminal record. . . . Black also could not proceed with an in vitro fertilization process with his fiancé because of his domestic violence convictions. . . .
>
> The timing of the motion for new trial also weighs against her credibility. M.B. testified that after the jury found Black guilty, Black did not have a relationship with his father. . . . However, Black and R.B. began to reconcile sometime last year, and they reestablished a relationship. . . . Thereafter, R.B. recanted his trial testimony on November 9, 2023. . . . Thus, M.B.'s testimony that Black did not assault R.B. is not credible [because she did not provide such testimony until after R.B. recanted his own testimony].

*Id.* at 12. This credibility determination was also within the trial court's discretion.

{¶ 13}   Ultimately, we agree with the trial court that Black failed to meet his burden under *Petro*.  Given that the affidavits of R.B. and the testimony of M.B. were deemed to be not credible, Black failed to show the presence of the first *Petro* factor.  Moreover, Black has not provided an explanation why M.B.'s testimony could not have been presented at his initial trial or that her testimony "could not in the exercise of due diligence have been discovered before the trial," as required under the third *Petro* factor.  *Petro* at syllabus.  Finally, while R.B.'s affidavit is a "complete recantation," as Black suggests, it "merely impeach[es] or contradict[s] the former evidence," rendering it inherently suspect under the sixth *Petro* factor.  *Id.*

## V. CONCLUSION

{¶ 14}   For all these reasons, we conclude that the trial court did not abuse its discretion in denying Black's motions for a new trial.  Accordingly, his sole assignment of error is overruled, and the judgment of the Franklin County Municipal Court is affirmed.

*Judgment affirmed.*

MENTEL and DINGUS, JJ., concur.

_____